ENTERPRISE IRRIGATION DISTRICT ET AL., APPELLEES, V. TRI-STATE LAND COMPANY ET AL., APPELLANTS.

FILED OCTOBER 18, 1912. No. 17,522.

1. **Waters:** IRRIGATION: APPROPRIATION OF WATER. Before the 1911 amendment to section 18, ch. 69, laws 1895, and under the irrigation act of 1889 (laws 1889, ch. 68), one who has constructed a canal for the purpose of carrying water for hire to be used upon the lands of others, and is ready and willing to furnish the water to such landowners as will take it, has made the only application of water to a beneficial use that he can make, and his right to an appropriation continues as a developing right until all lands along the canal for which the water was originally appropriated use the same; provided, formerly, that the water be applied to the land within a reasonable time, and, now, within the time limited by statute.

2. **Statutes:** IRRIGATION ACT: CONSTITUTIONALITY. The constitutionality of the irrigation act of 1895 and of the provisions thereof creating the state board of irrigation and conferring on the board the right to determine priorities, reaffirmed—following *Crawford*

*Co. v. Hathaway*, 60 Neb. 754, 61 Neb. 317, 67 Neb. 325, and *McCook Irrigation & Water Power Co. v. Crews*, 70 Neb. 115.

3. ———: ———: DUE PROCESS OF LAW. Where a statute authorizes a proceeding under the police power of the state affecting property rights, and does not expressly provide for notice to be given to the property owner, the right to notice is implied, and where a proper notice has been given, under a procedure authorized by the legislature, and the party interested has appeared, he has not been deprived of any of his rights without due process of law.

4. ———: ———: ———. The legislature has power to delegate the duty of formulating rules of procedure before the state board of irrigation, and the fact that the method of procedure is not embodied in the statute does not render due process lacking in the proceedings of the board.

5. Waters: IRRIGATION: APPROPRIATION OF WATER: PRIORITIES. In determining priorities of appropriation under the act of 1895, the transcripts of posted and recorded notices transmitted by the county clerk to the state board of irrigation constitute the "claims" for adjudication.

6. ———: ———: ———: ISSUANCE OF CERTIFICATE: LIMITATIONS. The limitation of 30 days within which to issue a certificate by the board of irrigation, under section 21 of the 1895 act, is merely directory. Such certificate does not constitute the adjudication, but is merely evidence thereof.

7. ———: ———: ———: POWER OF STATE BOARD OF IRRIGATION. In determining priorities under sections 15-27 of the act of 1895, the board of irrigation, although it might recognize and determine existing conditions and limitations, was without power to impose new.

8. ———: ———: ———: ABANDONMENT. Under the facts set forth in the opinion, *held*, that the right of the Tri-State Land Company to an appropriation, as successor in interest of the Farmers Canal Company and Roberts Walker, was not lost by lack of diligence, nonuser or abandonment.

9. ———: ———: ———: NOTICE OF CLAIM: RECORD. The posting and recording of notices of "claims" to the waters of the state, under the laws of 1889, ch. 68, *held* to be a public record, of which all parties interested were bound to take notice, and with knowledge of which they were chargeable.

10. ———: ———: ———: ESTOPPEL. After it had been adjudged that Roberts Walker had a valid appropriation to 1,142 6-7 cubic feet of water per second of time from the North Platte river,

with priority dating from September 16, 1887, the Tri-State Land Company purchased all his rights in the appropriation and canal. It immediately began the expenditure of large sums of money in the enlargement and completion of the canal, and carried the same forward with diligence from year to year until it had expended nearly $2,000,000. In 1906 it applied to and received leave from the state board of irrigation to construct a needle dam in the river for the purpose of conducting water into its headgate, and thereafter erected the same at large expense. There being insufficient water in the river during the months of July, August, and September to supply the amount claimed by the Tri-State Land Company and also to supply the amount to which the plaintiffs are entitled, plaintiffs began this action in 1909 for the purpose of adjudicating priorities of the respective water users in the river, and procuring a decree that their rights are superior to those of the Tri-State Land Company except as to about 28 second feet, and for an injunction to restrain the use or diversion of more than that quantity of water by the defendants. *Held*, That since the plaintiffs stood by for more than four years with full notice and knowledge of the "claims" of the defendants to an appropriation of 1,142 6-7 second feet, and permitted defendants to expend nearly $2,000,000 without objection or without notice of their claims to a prior appropriation, and without beginning an action to restrain the diversion of the water in excess of the amount which they concede defendants are entitled to, they are estopped, after the substantial completion of the canal and works, to maintain this action.

APPEAL from the district court for Scott's Bluff county: RALPH W. HOBART, JUDGE. *Reversed and dismissed.*

*C. C. Flansburg* and *Wright & Duffie*, for appellants.

*Morrow & Morrow, Harry N. Haynes, Wilcox & Halligan, G. J. Hunt* and *W. W. White*, contra.

LETTON, J.

This action was begun on August 23, 1909, by the Enterprise Irrigation District claiming an appropriation of water from the North Platte river, under a claim made by the Enterprise Ditch Company in March, 1889, to whose rights the plaintiff has succeeded by purchase. A large number of other persons and corporations claiming ap-

propriations of water from the North Platte river in Scott's Bluff and Cheyenne counties are made parties defendant. When the issues were finally made up, it appeared that plaintiff and each of the defendants except the Tri-State Land Company and the Farmers Mutual Canal Company were interested in having the prayer of the petition granted, and that practically the same relief is sought by each of them against two defendants named. There is one exception to this general statement, which will be hereafter noted. Throughout the opinion therefore, for convenience, the two latter-named companies will be designated as defendants and all the other parties as plaintiffs. The state board of irrigation and the secretary of the state board will be hereafter termed the state board or the secretary, as the case may be.

The pleadings are exceedingly lengthy and involved, therefore no attempt will be made to set them out in detail. The cause was tried upon the pleadings and upon an agreed stipulation of facts, so that the questions presented are practically questions of law.

The dispute may be summarized thus: The defendants claim an appropriation of water to the extent of 1,142 6-7 cubic feet prior in point of time to an appropriation by any of the plaintiffs, and an adjudication in their favor by the state board to this extent. The plaintiffs' claim is that an appropriation to the extent of more than 28 feet never actually vested in the Farmers Canal Company or its successors, and that by the actual beneficial use of water by the plaintiffs before the water had been put to beneficial use by the defendants, and before the canals of defendants had been constructed, plaintiffs acquired a prior right to all but 28 second feet of the water claimed by defendants. They further contend that, if the Farmers Canal Company ever acquired an appropriation for the full amount, it had lost the same by nonuser. The defendants assert the validity of their appropriation, that it is prior in point of time to that of any of the plaintiffs, and deny its loss by nonuser or abandonment. They also plead

an estoppel by reason of plaintiffs standing by with knowl-
edge of their claims for years and allowing them to ex-
pend vast sums of money in the carrying out of their en-
terprise, without notice of any hostile or adverse claim of
superior right until after the works were practically
completed. At the close of the trial the court found for
each and all of the plaintiffs and cross-petitioners, except
the Mitchell Irrigation District, and rendered a decree
which ascertained and adjudged the respective appropria-
tions to which the parties were entitled and established
their respective priorities, without reference to the action
of the state board in 1896 and 1897. The Tri-State Land
Company and the Farmers Mutual Canal Company were
adjudged to have an appropriation of 28.57 cubic feet per
second only, instead of 1,142 6-7 second feet as claimed,
with priority dating from September 16, 1887. As to any
excess over this amount, if an appropriation was ever
acquired, it had become lost by a failure to apply the same
to a beneficial use for a continuous period of more than
ten years. As to the Mitchell Irrigation District, the court
found that, because its canal heads in the state of Wyom-
ing and the water is diverted into it in that state, the court
had no jurisdiction of the subject matter of its cross-peti-
tion, and the same was dismissed.

Much abbreviated, but preserving those facts we con-
sider material to the controversy, the stipulation of facts
upon which the case was submitted shows that the lands
are in the valley of the North Platte river, and that the
amount of water flowing in the bed varies greatly at diff-
erent times in the year. During April, May and June the
amount usually has been sufficient to supply all water
necessary for irrigation to the canals thus far constructed.
There are no tributaries between the headgate of defend-
ants' canal and the headgate of the canals of any of the
plaintiffs. If no water were diverted at defendants' head-
gate, the quantity of water flowing would not be materially
increased or diminished when it reached the headgate of
the lowest canal, belonging to a party to this suit. On the

16th of September, 1887, the Farmers Canal Company, a corporation, posted a notice at the proposed point of diversion of its intention to divert from the North Platte river for the purpose of irrigation a quantity of water sufficient to fill a canal 40 feet wide on the bottom and carry water to a depth of 4 feet, and on the same day notice was duly filed and recorded in the office of the county clerk of Cheyenne county which at that time included the territory now embraced in Scott's Bluff county. In March, 1888, the Farmers Canal Company commenced the construction of the canal, and continued work on it until about the year 1890, at which time it was constructed a distance of about 10 miles. The ditch was then about 12 feet wide on the bottom just below the headgate. The first mile was about 6 feet deep, and was capable of carrying water to a depth of 2 feet. There were not more than 1,500 acres susceptible of irrigation from the canal as then constructed, and the capacity of the canal was not sufficient to carry water for more than 1,000 to 1,200 acres of land. On November 17, 1890, this company posted at the headgate, and filed for record in the office of the county clerk of Scott's Bluff county, a notice of its intention to divert water, in addition to its former claim, to the amount of 200,000 miner's or statutory inches. The notice also specified that the canal shall be 80 feet wide on the bottom, with a slope of one to one, and a depth of 8.84 feet at the point of the diversion, with an average grade of not more than 2 feet per mile. In 1891 the canal company issued bonds secured by mortgage upon all its property, and sold about $80,000 worth. In the spring of 1892 it resumed work on the canal with the proceeds of the sale, constructed a substantial headgate costing about $8,000, and excavated the canal to a width of about 100 feet to a point 500 feet below the headgate, and from there to a point about 4,000 feet below to a width of 60 feet on the bottom, and from there to a point about 19 miles below to a width of 30 feet on the bottom, and water was conducted from the river therein. The canal as constructed was

capable of carrying water to a depth of 6 feet, and was of sufficient capacity to irrigate 30,000 acres of land. Twenty-five miles of the canal from a point below the 19 miles mentioned had been opened up at various places to the full width, and nearly one-quarter of the work thereon had been performed in detached sections, but had not been connected up with the 19 miles above. All this work was accomplished by June 1, 1893, at a total expenditure of about $96,000, when the company ceased work on the canal because of inability to procure funds, except that it kept one team employed which continued excavation work until October, 1895. From that time the Farmers Canal Company did no further work upon the canal. As then constructed there were 5,661.5 acres of land susceptible of irrigation from the canal, and other lands lying under the Enterprise and Ramshorn ditches to the amount of 2,540 acres which were also susceptible of irrigation from this canal, had not the Enterprise and Ramshorn ditches been built to irrigate such lands. Prior to 1897 not more than 500 acres had been irrigated annually from the canal; prior to 1907 not more than 2,000 acres; in 1907, 5,000 acres; in 1908, 7,000 acres; in 1909, 10,000 acres; and in 1910, 20,000 acres of land were irrigated from the canal. In 1897 and 1898 work was done by the company and users of water with its consent in repairing the canal and protecting its banks and headgate. After work ceased, the company endeavored to sell its bonds and to exchange bonds with different contractors for the purpose of building a canal, which negotiations continued until after the mortgage upon the property was foreclosed.

The stipulation sets out with much particularity that, at various dates in a period extending from January 14, 1888, until the 1895 act took effect, the other plaintiffs or their grantors, except the Steamboat Ditch Company and the Gering Irrigation District, each posted notices and duly filed and recorded the same, claiming various amounts of water from the river, and that each constructed canals and appropriated the amounts of water it now claims in

the petition and cross-petitions. The Steamboat Ditch
Company made application to the state board under the
1895 act on October 22, 1895, and the Gering Irrigation
District on March 15, 1897, for permits to appropriate
water. Permits were granted, their canals were con-
structed, proofs filed with the state board as to each of
said claims, and a certificate was issued to the Gering
Irrigation District, the priority dating from March 5,
1897. In May, 1895, the county clerks of the two counties
in which the lands irrigated lie made transcripts of the
notices of appropriation on file in their respective offices
and transmitted them to the secretary of the state board
in whose office they were filed on May 31, 1895. After
the transcript was filed the secretary sent to each of the
claimants named in the notices a blank claim to be filled
out. A copy of this blank is attached to the stipulation.
This blank is in form an affidavit, and sets forth the name
of the claimant; the purpose for which water is claimed;
the name adopted for the ditch; the source of the appro-
priation; its amount; the location of the headgate; the
length of the ditch; the sections of land through which
the canal passes; together with a plat showing the same;
the portions of the canal completed or not completed; the
dimensions of the uncompleted portions; total excavation;
length of fluming required; material removed and fluming
completed; estimated cost; expenditure thus far incurred;
land to be irrigated; time of beginning work; when works
were or will be completed; whether claims are made on ac-
count of application of the water to a beneficial use with-
out objection or by posting notice and filing the same;
when water was or will be turned into the ditch; acres
actually irrigated and estimated to be irrigated; and the
relation which the affiant bears to the ditch, canal or
other work.

On August 20, 1895, the state board adopted resolutions
providing and establishing at large and in detail the pro-
cedure and practice of the board in ascertaining and ad-
judicating water rights already vested, and for the con-

sideration of new applications for the use of water. It also provided for practice and procedure in case of the contest of claims. These rules provided for notice, and for hearings, rehearings, and appeals. Prior to June 5, 1896, the rules adopted by the state board were printed in full in pamphlet form, and, as so established and published, were accepted by the state board and its secretary in matters of procedure thereafter. On the 5th of June, 1896, the secretary mailed a notice with a copy of the rules to each and all of the parties to this suit or their predecessors in interest. This notice was as follows: "Office of State Board of Irrigation. Lincoln, Nebr., June 5, 1896. Notice. Notice is hereby given that the hearing in the matter of adjudicating rights to the use of water claimed prior to April 4, 1895, within the water-shed of the North Platte and Platte rivers, will be held for the several counties therein, by an officer of the state board of irrigation at the places and upon the dates indicated, as follows: (Omitting other counties.) For Cheyenne and Banner counties, in Bayard, on Tuesday and Wednesday, July 14 and 15, 1896. For Scott's Bluff and Sioux counties, in Gering, on Friday, July 17, 1896, at office of O. W. Gardner. Claimants are expected to attend at hearings for their respective counties in order to furnish to the officer presiding at said hearing the necessary proofs, if any be required, to sustain their claims; otherwise said claims will be dismissed. State Board of Irrigation. W. R. Akers, State Engineer, Secretary." This was the only notice forwarded by the board or its secretary to any of the parties to this action. On and prior to the 17th day of July, 1895, the owners of the Brown's Creek, Chimney Rock, Castle Rock, and Alliance ditches procured to be filled out, verified and filed with the secretary, by some of the officers of their respective companies, the blank forms sent out by the secretary. On July 14 and 15 the secretary at Bayard, Nebraska, made inquiries and took evidence as to the claims of the owners of Chimney Rock, Nine Mile,

12

Alliance and Logan canals, and the claim of the Belmont canal was submitted on the record, without evidence. On July 17 the secretary made inquiries and took evidence at the office of O. W. Gardner, in Gering, Nebraska, in reference to the claims of Yorick Nichols and Carrol Nichols and the owners of the Enterprise, Castle Rock, Minatare, Central and Farmers canals. No contest was made as to any of the claims. The evidence was reduced to writing and made a matter of record in the office of the secretary. . The stipulation then sets out the evidence offered in behalf of the Farmers Canal Company. This shows, in addition to the facts already stipulated, that the cash investment was something over $100,000, and that the canal was designed to irrigate 80,000 acres; that the canal did not strike the large bodies of land until the lower end, and that the company expected to resume work in the near future and were still negotiating in order to procure money. At this time the secretary allowed the company 30 days in which to file a claim setting out specifically the lands they expected to water. No other hearing with reference to the above claims or either of them was ever applied for, ordered, or held, except that the Steamboat, Castle Rock, Belmont and Alliance ditches had rehearings on their respective applications subsequent to April 7, 1897, without notice to other claimants. The Farmers Canal Company, through an officer, filled out the blank claim affidavit, and filed the same on September 19, 1896, claiming 1,142 6-7 cubic feet per second of time, with priority from September 16, 1887. On January 7, 1897, the secretary rendered an opinion on the claim of the Farmers Canal Company, made the same a matter of record in his office, and forwarded a copy to the company, but no copy or notice of the opinion was sent or given to any of the other claimants for water. On the same day the secretary filed written opinions allowing the claims of the Enterprise, Minatare, Castle Rock and Central ditches, and at various dates from January 8, 1897, to January 28, 1897, opinions were filed allowing the claims of the Nine Mile,

Winter's Creek, Ramshorn and Brown's Creek ditches and adjudicating their respective priorities. On April 7, 1897, the state board, without notice other than may be imputed by law, caused a resolution to be entered upon its record affirming the findings of the secretary as to the claims of these parties, except Castle Rock, which was finally approved on September 22, 1897. None of the claimants were notified within 30 days of the adoption of this resolution, none of the plaintiffs acquired any knowledge or information concerning the same for several years after the adoption thereof. At various dates in August and September, 1898, other written opinions were filed as to the claims of the Belmont, Alliance and Chimney Rock Ditch companies, and on January 2, 1897, these opinions were affirmed by resolution as in the former claims. None of the opinions or resolutions, and no certificates as to priorities, nor any other information with reference to claims was ever transmitted to the county clerk of the respective counties, nor were any of such documents ever filed or recorded, except the opinion with reference to the claim of the Farmers Canal Company which was filed and recorded in the office of the county clerk of Scott's Bluff county on the 27th of December, 1905.

The stipulation then sets forth at length the default of the Farmers Canal Company upon its bonds; the foreclosure of the trust deed; and the purchase at the foreclosure sale of all the property of the company by Roberts Walker on December 23, 1901. It also recites the filing of an application in the office of the secretary on April 14, 1902, by one William Frank to appropriate water for a canal to be built along substantially the same line; the filing of protests by that company; intervention by the Farmers Irrigation District (which had also filed an application in June, 1902, for water to cover a part of the same territory); that a hearing was had, and the applications denied; that appeal was taken to the district court, which reversed the board, and that on appeal to the supreme court of the state of Nebraska its decision was

affirmed. It is also shown that by the final judgment of the district court the findings of the state board, "in so far as it finds the said Roberts Walker as the successor in interest of the Farmers Canal Company entitled to an amount of water from the North Platte river not to exceed 1,142 6-7 cubic feet per second of time, are hereby ratified and affirmed."

In 1904 the Tri-State Land Company was organized, and in February, 1904, it entered into an agreement with Roberts Walker for the purchase of the property conveyed to him under the decree of foreclosure, by which agreement $60,000 was to be paid to him for the property in the event that the adjudication of the state board should be confirmed by the supreme court, and $21,000 should be paid for the property if the judgment of the district court in the *Frank* case should be affirmed. After the judgment of the supreme court it received deeds and conveyances from Roberts Walker and from the Farmers Canal Company to the property. In August, 1905, the Tri-State Company began the reconstruction and enlargement of the canal, and also began to excavate, reconstruct and enlarge that portion of the canal lying below the 19-mile portion through which water had been theretofore conducted. In 1905 it expended in resurvey, reconstruction, machinery, tools and labor, $133,066.46; in 1906 and 1907 work was prosecuted so that in the spring of 1907 the canal was constructed full size to a distance of 40 miles below the headgate. In September, 1906, application was made to the state board for leave to construct a needle dam across the river, which was granted in October, 1906, work begun, and $8,000 expended thereon. In that year the company expended in enlargement, construction, deepening and widening, $499,491.87; in 1907 the amount expended on dams, waste way, construction, etc., amounted to $323,386.87, and the canal at the close of that year was completed for 60 miles and was capable of irrigating 60,000 acres of land. In 1908, $52,410.67 was expended, and in 1909 $464,535.13 was expended, and at the

close of that year the canal was capable of irrigating all of the land described in the opinion of the secretary and the claim of the Farmers Canal Company. The amount expended in 1910 is also set forth, but this we deem immaterial under the issues. Before this action was begun the Tri-State Land Company sold and conveyed to the Farmers Mutual Canal Company all of its property, taking in payment therefor the stock of said latter company. It now controls a majority of the stock, but has sold parties under its canal some 25,000 shares.

The average flow of the North Platte river during the last half of July and in August, September and October, at or near the headgate of the canal of the Tri-State Company, does not exceed 800 second feet, and frequently runs as low as 300 second feet; that in those months in 1910 the Tri-State Company diverted from 300 to 400 second feet, and during portions of the time this diversion exceeded all the water flowing in the bed of the river at that point; that, while the Tri-State was diverting all the water flowing in the river at its headgate, water had come to the surface below and was flowing in the river so that some of the plaintiffs received a specified part of the water they were entitled to. In July, 1910, the state board caused the headgates of the canals of all the parties to this action except the Tri-State Company to be closed, in order to allow the water to flow to an alleged prior appropriator whose canal is located near North Platte, Nebraska. Because of the rendition of the opinion on the claim of the Farmers Canal Company and the resolution of the state board, said board refused to close the headgate on the canal of the Tri-State, and the board claims that the Tri-State has a prior right to any of the parties to this action to divert 1,142 6-7 second feet as needed; that, unless restrained, the Tri-State Company will, under the direction and permission of the state board, divert the full amount of water claimed by it, even though the diversion consumes all the water flowing in the river. The irrigated lands have been used for the raising of diversi-

fied crops, but certain crops require irrigation during July, August and September; that the crops which require irrigation during these months are most profitable and remunerative; that, in case any of the lands under the ditches do not receive water during these months, the owners will be compelled to raise less remunerative crops, or will be compelled to procure reservoir water at an added expense. This terminates the stipulation of facts.

The questions involved in this case are of the deepest importance, not only to the parties actually before the court, but to every owner of irrigated land in the state of Nebraska, since the plaintiffs challenge all right and authority of the state board to adjudicate priorities of appropriation under the act of 1895. If this contention be upheld, then more than 1,000 adjudications of prior claims which have been made by that board since the time of its first organization until today, a period of over 16 years, are absolutely void. Moreover, whatever the conclusion of the court may be, it is almost inevitable under the peculiar circumstances of the case that one party or the other will suffer serious loss. It is, therefore, with a deep sense of responsibility and a keen appreciation of the serious results, not only to the parties before the court, but to a vast number of water users in the state of Nebraska, that we approach the consideration of the questions involved.

The appellants contend, first, that the district court had no jurisdiction to establish priorities, that being exclusively for the state board; second, that the rights of the defendants were fixed and determined by the state board in the *Frank* case as affirmed by the supreme court, and that any attack thereon in a collateral proceeding can be of no avail; third, that there was no forfeiture; fourth, that by their own conduct the plaintiffs are estopped to assert any right as against the defendants' claim.

On the other hand, plaintiffs contend that defendants never acquired an appropriation for more than the amount of water allowed by the district court, for the reason that,

although the preliminary steps—the posting and recording of notice—were taken and the intention to apply water for beneficial use existed, yet the work was not prosecuted to completion with diligence, and water in excess of the amount allowed was not conducted to the place of intended use and applied within a reasonable time. It is also contended that the Farmers Canal Company had no vested appropriation at the time the irrigation act of 1889 was passed.

With reference to the claimed adjudication by the state board, it is argued, first, that that board never made a final adjudication or an adjudication intended to be final; second, that the board does not possess power or jurisdiction to enter an order or decree conclusively establishing rights acquired prior to the act of 1895, for the reasons that the entry of such an order would require the exercise of purely judicial powers, which such board does not and cannot possess, and, further, that if it is possessed of judicial powers the method provided by the statute for adjudicating such rights does not constitute due process of law; third, that the manner in which the board proceeded did not constitute due process of law, and its proceedings so far as they purport to be conclusive adjudications are absolutely void. It is also contended that the opinion in the Farmers Canal Company claim is void because it attempted to award an appropriation in excess of the claim made. The plaintiffs also deny that this proceeding is a collateral attack upon the adjudication of the board, and maintain that this is a direct attack upon an order made in excess of jurisdiction, and that the proceedings of the board were erroneous to the extent that it would be unconscionable to permit them to stand. It is further contended that, if any appropriation in excess of 28 second feet of water was ever acquired by the defendants, the same has been lost and forfeited by nonuser. And, as to the claim of estoppel, it is argued that the mere fact that plaintiffs remained silent and did not assert any hostile claim is entirely insufficient to constitute an estoppel. It

is also maintained that the opinion of the state board in the Farmers Canal Company claim did not purport to adjudicate a vested and completed appropriation for any definite quantity of water, and that the right of that company was limited by the opinion to water acquired for such lands as should be irrigated prior to September 1, 1905; that the limitation of the appropriation, if construed to be in excess of the jurisdiction of the board, if excised from the opinion, radically reconstructs it and would render it either void or make it reach a result contrary to what was intended and declared; that, if construed as an attempt to adjudicate and perfect an appropriation of more than 7.15 second feet, such excess is unsupported by any recorded statement of claim or evidence, and was beyond the jurisdiction of the board; that, if it be assumed that the adjudication was valid, then the nonuser of any water in excess of 28.57 second feet, together with the use during ten years by the other parties of all water in the river during low stages, has occasioned by prescription a loss to defendants and a corresponding gain to plaintiffs in the order of their priority.

Much of the argument in behalf of some of the plaintiffs discusses the question as to what constitutes an appropriation, and it is maintained with much force that there can be no valid and vested appropriation until the water diverted has been actually applied to a beneficial use. Many decisions of the courts of Colorado and other states are cited to uphold this contention. A different view is taken in the brief of counsel appearing for the Belmont Company and Alliance Irrigation District. Quoting and construing the statutes of 1889, he says: "The legislature never meant to encourage any one to invest their money in an enterprise, supposedly for a public good, and then to take away from him or them their appropriation simply because the landowner did not take the water within a specified time. That was a provision of subsequent legislation. The principle of the application of water to land before the absolute vesting of the appropriation was not

of the essence of the act. * * * There is nothing in the act that in anywise indicates that water must be applied to land in order to make the appropriation absolute. The act provides that, within a certain time after the posting of the notice, actual work of construction must be begun and in good faith carried forward to completion, and that by 'completion' is meant conducting the water to the place of intended use—to such place on the line of the canal as the landowner desires to receive it into and carry it through his laterals. * * * The act of 1895 (section 28) speaks of the application of water to a beneficial use, or for beneficial purposes, but the act of 1889 nowhere does. After a canal was constructed under the prior act, therefore, and the water conducted through the same, if the owner at all times stood ready and willing to carry water for such landowners as would take it, he made all and the only application that he could make, and all that the act expected him to make, and his right to his appropriation continued as a developing right until all lands under the canal were using water, and thereupon ripened into a complete appropriation." Counsel for other plaintiffs also concedes that "in some states, by statute, an appropriation is treated as effected when all the works are completed, the water is available for use, and there are lands reached by the system ready to be tilled by its occupants. In other states, by statute, the appropriation is not deemed complete until the beneficial use of water occurs. Such was the rule prior to legislation." See, also, sections 8-10, ch. 68, laws 1889, defining appropriation and completion of work. This subject is also considered to some extent in the monographic note to *Nevada Ditch Co. v. Bennett,* 60 Am. St. Rep. 777, 816 (30 Or. 59), where the commentator says: "The appropriation of water for sale to others is authorized by the statutes of the states in which it is valuable for that purpose, and, in many instances, the chief, and even the sole, object of an appropriator is not that of any use by him in and upon his own lands or mines, but the sale of the water to others who have mines to be worked

or lands to be irrigated.  In cases of appropriation for the purpose of supplying water to others, we do not understand how it can be said that the use of the water is an essential element of its appropriation.  If the intended appropriator constructs the works and appliances necessary for the diversion of the water and the carrying of it to points where its use is desirable and profitable, and has actually carried it there, or is ready and willing to do so, and offers it to all persons who are willing to pay for its use, we apprehend that his appropriation is complete, though the persons to whom it is thus offered refuse to receive or use it. They certainly cannot thus defeat the rights of the diverter."  What the rights of the canal owner or of subsequent takers may be in such case it is unnecessary here to consider.  A discussion as to this point may be found in *Sowards v. Meagher,* 37 Utah, 212, 108 Pac. 1112.  This court has repeatedly said that a canal company is to a certain extent a public service corporation; that it does not own the water that it carries, but acquires by appropriation the right to divert the same and to charge a reasonable fee for the carriage of the same to the lands upon which it was designed to be used.  *Paxton & Hershey I. C. & L. Co. v. Farmers & Merchants I. & L. Co.,* 45 Neb. 884; *Castle Rock I. C. & W. P. Co. v. Jurisch,* 67 Neb. 377; *McCook Irrigation & W. P. Co. v. Crews,* 70 Neb. 115. Without further discussion, we are content to adopt the views as to what constitutes an appropriation under the act of 1889 thus stated by counsel, so far as relates to appropriation by a canal owner who is a carrier of water to be applied to a beneficial use upon land owned by others, with the reservation, however, that the water, formerly, must have been applied within a reasonable time in order to retain the first right to take it from the river, and, now, it must be applied within the time limited by the statute. Comp. St. 1911, ch. 93a, art. II, sec. 18.

One of the principal questions argued in the case is with respect to the validity and effect of the proceedings of the state board when it undertook to adjudicate priori-

ties under the command of section 16, ch. 69, laws 1895 (Ann. St. 1909, sec. 6795). We deem it unnecessary here to set out at length the provisions of the statute with reference to the adjudication of priorities, or the order which was made upon the claim of the Farmers Canal Company by the state board. These are all set out at length in the opinion in *Farmers Canal Co. v. Frank,* 72 Neb. 136. In that case it was held: "The powers of the state board of irrigation exercised under section 16, art. II, ch. 93a of the irrigation act of 1895, are *quasi*-judicial in their nature, and an adjudication by it of a right of priority of appropriation of water made before taking effect of the act of 1895, after proper notice, is final, unless appealed from, and cannot be collaterally attacked." That case was an appeal from an order of the board refusing two applications for appropriations on the ground that appropriations already were in existence for the same lands. The court decided in effect that, in a matter properly before it, the board had allowed an appropriation as claimed, and that it was concluded by its own prior order and adjudication. We are asked by the plaintiff to reexamine this doctrine, which it is earnestly contended is entirely erroneous and is based upon a misconception of the powers and duties of that board. In view of the fact that only a few pages of the briefs in that case were devoted to the discussion of this question, and that, as the writer recalls, but a short time was spent in oral argument, we have considered the learned and exhaustive arguments presented at this time and will endeavor to discuss them as succinctly as we may.

It is first contended that the state board does not possess power or jurisdiction to enter such an order or decree. It is argued that under the constitution the government of the state is divided into three distinct departments, the legislative, the executive, and judicial, and no person or collection of persons being one of these parties shall exercise any powers belonging to either of the others, except as heretofore expressly directed or permitted. The

same contention was first made in this court in the case of *Crawford Co. v. Hathaway*, 60 Neb. 754. The case was decided on another ground, but on this question, in the opinion by NORVAL, C. J., it is said: "It is conceded by appellant that any right it may have in the premises arises out of the irrigation act of 1895 (Comp. St. 1897, ch. 93a), and that without that act neither the appellant nor the numerous cross-petitioners have any right to the waters by them sought to be appropriated, unless the act of 1877 may have abrogated the common law rights of riparian owners, a question to which we will advert later. If this irrigation act of 1895 is valid and constitutional, the trial court properly refused to try and determine the right of priority between these litigants for the reason that the board of irrigation provided by that act is thereby given exclusive original jurisdiction to try those questions, and the same had not been by it heard or in anywise determined. Appellant admits the truth of this proposition, but seeks to avoid it by contending that that portion of the act which erects a board of irrigation, giving it exclusive judicial powers, is in derogation of section 1, art. VI of the constitution, in that the legislature by said act sought to erect a new judicial tribunal in place of one of the regularly constituted courts of the state. Without deciding that that portion of the act is unconstitutional, we will assume its invalidity for the purposes of this case, for a cursory examination of the act will convince any one that the board of irrigation was one of the inducements for its passage, and it is so interwoven with the whole act as to make it impossible to declare this portion thereof invalid without also effecting the destruction of the remainder of the act." On motion for rehearing an additional opinion was written by NORVAL, C. J., 61 Neb. 317. The opinion discusses, at length, at pages 325 to 328, inclusive, the question as to whether the act is unconstitutional for the reason that judicial powers are conferred upon the board. The writer, though evidently of the opinion that if the provisions with reference to the board fall the whole

act would fall with them, and implying, at least, that the act is valid, says the court expressly refused to decide this question because it "is not involved in the case at bar," and "it merely decides that, if the act in question is valid, plaintiff proceeded in the wrong forum." And it was said that, if unconstitutional with respect to the judicial powers of the board, it is void as a whole. A rehearing was had, and in an opinion prepared by HOLCOMB, J., the purpose of the act was stated more fully. 67 Neb. 325. It seems that the action was brought by the plaintiff below to have adjudicated the rights of 12 persons to the use of water flowing in the White river, and to enjoin Hall, a riparian owner, from interfering with the headgates and works connected with an irrigating canal being constructed by the plaintiff. The trial court refused to try the case on its merits for the reason that the water rights of the respective parties had not first been determined by the state board of irrigation. This court took a different view as to the rights of riparian owners, and the judgment was reversed and the cause remanded, with directions to try the case. The opinion of Judge HOLCOMB, after considering the question at some length, says at page 367: "Powers of the same general nature and character are conferred upon almost every administrative body known to the statute, and regarding which it has frequently been decided are of a *quasi*-judicial nature, and yet such bodies are invariably held to be administrative, and to in no way conflict with the constitutional provisions regarding officers and bodies upon whom judicial power may be conferred. The state board of transportation, as heretofore organized in this state, the constitutionality of which has been invariably upheld when attacked, in all respects, save as to the manner of passing the law providing for its creation, is a fair illustration of the validity of legislation of this character. Numerous other boards and offices created by statutes, of an administrative character, and yet possessing powers of a *quasi*-judicial nature, might also be referred to if thought to

serve any useful purpose. For the reasons given, we are of the opinion that the sections of the act in question are not obnoxious to the constitution on the objections raised by counsel, and that the authority of the board of irrigation to make the determinations contemplated by the act, and the requirement of its approval as a condition to the right of appropriation under the provisions of the act, is a valid exercise of leglislative power"—citing *Farm Investment Co. v. Carpenter*, 9 Wyo. 110. As to this point Judge SEDGWICK concurred, saying: "Those parts of the irrigation act of 1895 which provide for a board of irrigation, and the adoption of the rule of ownership of water by appropriation, are constitutional." In *McCook Irrigation & W. P. Co. v. Crews*, 70 Neb. 115, the constitutionality of the irrigation act of 1895 was again challenged, but the law was again sustained by the court.

In the face of these decisions it hardly seems necessary to again consider the question, but we have done so, and have examined further authorities. It is a matter of common knowledge that both in the administration of the laws of the United States and of the several states, boards or individuals, for the purpose of exercising executive or administrative functions, are often compelled to inquire into and determine questions requiring the exercise of powers judicial in their nature. Some of such determinations are often, by virtue of the statutes defining the functions and power of the tribunal, final and decisive, and others are made reviewable by appeal to the courts. For example, the determination of the general land office with respect to controversies over claims to the public lands; the action of boards of medical examiners in granting or refusing diplomas to persons seeking to practice medicine; the determination by boards of county commissioners in this state that the formation of a drainage district will be conducive to public health, or that the establishment of a highway is necessary; the judgment of a commission created by congress to pass upon the validity of private land claims in territory ceded to the United States. Number-

less other instances may be adduced. Whether reviewable by the courts or not, the exercise of such powers by tribunals of this nature has seldom been held to be a violation of the constitution in this respect. McGehee, Due Process of Law, 162, 368; *Reetz v. Michigan,* 188 U. S. 505; *Gardner v. Bonestell,* 180 U. S. 362; *Bates & Guild Co. v. Payne,* 194 U. S. 106; *People v. Simon,* 176 Ill. 165; *Farm Investment Co. v. Carpenter,* 9 Wyo. 110; *State v. Thorne,* 112 Wis. 81, 55 L. R. A. 956; *Gee Wo v. State,* 36 Neb. 241; *Lincoln Medical College v. Poynter,* 60 Neb. 228. We are satisfied with the conclusion reached by this court in the cases cited, which were followed in *Farmers Canal Co. v. Frank,* 72 Neb. 136, and see no reason to change our conclusion in this respect.

On the point that the action of the board in adjudicating priorities does not constitute due process of law for the reason that the statute does not specifically provide for notice to the parties, we are of opinion that where a statute under the police power of the state authorizes a proceeding affecting the property rights of any person, and does not expressly provide for notice to be given, the right to notice is implied, and that where a proper notice has been given, under a procedure authorized by the legislature, and a party has appeared, he has not been deprived of any of his rights without due process of law. And this is more especially the case where the proceedings are not in the nature of proceedings at law or in equity. The constitution and the statute will be construed together as one law. *Baltimore & O. R. Co. v. Pittsburg, W. & K. R. Co.,* 17 W. Va. 812, 835; *Paulsen v. Portland,* 149 U. S. 30; *Kentucky Railroad Tax Cases,* 115 U. S. 321, 334. See, also, McGehee, Due Process of Law, 82, and cases cited in note to *Sterritt v. Young,* 4 L. R. A. n. s. 169 (14 Wyo. 146), beginning with page 173. Plaintiffs cite *McGavock v. City of Omaha,* 40 Neb. 64, to sustain their proposition. Although the writer of the opinion in that case seems to think that the authorities preponderate in favor of the view that notice must be prescribed in a statute in order

that it be valid, the court expressly confines the holding to the proposition that, if notice is not given in condemnation proceedings, the right to bring an action for damages is not barred. This case, therefore, is no authority in support of the proposition.

By the act of 1895 the legislature committed the duty of prescribing the method of procedure with respect to such adjudications to the state board. That board formulated rules providing for notice, and allowing for hearings and appeals. We think the legislature had power to delegate this duty to that body, and that the fact that the method of procedure was not embodied in the statute does not render due process lacking in the proceedings.

It is contended that the opinion of the secretary was void because it was in excess of the claim filed by the company. It is assumed by the plaintiffs that the "claim" adjudicated by the board was the affidavit filed by the Farmers Canal Company, but in this we think they are in serious error. The "claim" which the board investigated, and which the statute mentions, is "the claim for appropriation *now on record*" (section 16), and it is as to this claim, and other claims based upon actual use without posting, that "the method of determining the priority and amount of appropriations shall be determined by said state board." Moreover, in the 1889 report of the state board the method of adjudicating claims is set forth, and it is shown that the copies of notices posted and filed, transmitted by the county clerks, and the claims presented to the board by parties who neglected to post notices, but who had previous to 1895 appropriated and used water, constituted, according to its practice, the claims to be adjudicated. We are of opinion that, even if no blank claim affidavit had ever been filed by the company, as in fact none was filed until long after the hearing had been had, the board would still have had power and jurisdiction to determine the validity and priority of claims "now on record." The rules of the board clearly show that the affidavit filed by claimants under recorded notices was

intended to be taken as evidence, and not as a pleading. The opinion shows that "the claim   *   *   *   is made by virtue of posting three notices of appropriation at the proposed point of diversion," setting forth specifically the time of posting and recording each notice. The authorities cited to sustain the proposition that a judgment in excess of the claim made in the petition is void are, therefore, inapplicable, and the finding was not in excess of the claim made. In this connection plaintiffs' counsel say: "If we assume that the board had jurisdiction to hear and determine the claim of the Farmers Canal Company as against other claimants to the use of water from said river, then we are perfectly willing to concede that, *if the board made an adjudication that the Farmers Canal Company was entitled to an appropriation greater than it was possessed of at that time, it would be final,* provided that said company claimed. an appropriation to the extent of its allowance by the state board, and other claimants had knowledge thereof; but we do not concede that, if a claimant only asks for an appropriation of 10 cubic feet of water, the state board has jurisdiction to grant to him 1;000 cubic feet of water; or, if he makes application for a permit to appropriate or claims an inchoate or incomplete appropriation, that the state board has jurisdiction to allow a completed appropriation." By this concession in the brief it would seem that plaintiffs themselves take the same view as this court did in the *Frank* case, since by the several notices, which were matters of public record of which the plaintiffs were charged with notice, the Farmers Canal Company claimed an amount of water greatly in excess of the allowance made to it by the state board. The fallacy in the argument of plaintiffs' counsel is that the posted and recorded claims, which under the statute were the basis and the moving cause for the action of the board, are treated as of no force or effect, and the claim affidavit subsequently filed is assumed to be a pleading by which the authority of the board is limited.

**13**

It is insisted that because the act of 1895 (section 19) provides that "when the adjudication of a stream shall have been completed it will be the duty of the state board to make and cause to be entered of record in its office an order determining and establishing the several priorities," etc., the action of the board upon the claim of the Farmers Canal Company was void, for the reason that the adjudi-cation on the stream had not been completed when the opinion was filed and affirmed. It is shown, however, that hearings had been had upon all the claims to the water from the North Platte river; that the secretary proceeded to examine and render opinions upon each claim; that on January 7, 1897, opinions were rendered by him upon the claims of the Farmers Canal Company, and others, and from time to time opinions were rendered on other claims. On April 7, 1897, the opinions upon these and other claims, from which appeals were not taken, were affirmed by resolution of the board. A hearing was had as to the claims of several of the plaintiffs, and a subsequent resolution adopted on January 2, 1899, affirming the opinions rendered on rehearing. It would seem that, while the secretary filed his opinion on each claim as soon as he had reached a conclusion with regard to its validity and priority, the board itself took no action in the matter until the investigation was completed, when it affirmed the opinions *en masse*. The fact that rehearings were granted in a few cases could not operate to divest the board of the power it possessed and had already exercised. Even if the decision was premature, we are inclined to the view that it would be a mere irregularity, and not a void act.

Plaintiffs also argue that rule 3 of the board implies that the adjudication provided for was not intended to be final, because it provides that "the first adjudication of the rights of claimants shall be conducted for the purpose of determining the validity of claims," etc. This was what was actually done, that is, the validity of the claims, evidenced by the posted and recorded notices claiming water in specified quantities with priorities dating from the

posting and recording thereof, were actually determined, and, when this was done, no further adjudication upon this point could be had. It appears also from an examination of the entire body of rules that no other hearing or adjudication is provided for thereby, except in cases of contests or rehearings before the secretary or the board.

It is also contended that, because no certificate was issued within 30 days after the determination of the board, its adjudication was not final and there was nothing from which any of the parties could have appealed to the district court. The limitation of 30 days in which to issue the certificate we think is merely directory. The certificate required by the statute does not constitute the adjudication, but is merely evidence thereof.

It is next insisted that the language of the opinions themselves shows that they were not intended as final adjudications, that the board and its secretary followed the practice which seems to have prevailed in the courts of Colorado, by which in proceedings to settle water rights decrees may be rendered, both final and interlocutory in their nature; final and conclusive as to water which the court found had already been applied to a beneficial use, and conditional or interlocutory in that they recognized and declared the capacity of the canal and the quantity of water required for future use and decreed a right to the same, contingent upon the exercise of diligence in constructing the ditch and applying the water from the same to a beneficial use. It is not improbable that the board of irrigation had the Colorado practice in mind. There is no statute in this state authorizing such conditional decrees in a proceeding brought before the state board to ascertain and adjudicate priorities. The statutory duty of the board in this connection was to ascertain the rights which had become vested before the taking effect of the act of 1895 and the extent of such rights. Their powers were special and limited, and could not exceed the statutory grant. After the taking effect of the act of 1895, all water in the streams of the state, the right

to appropriate which had not already vested, could only be set apart to individuals by obtaining a permit from the state board under the manner of procedure specified in sections 28 to 31, inclusive, of the act. In so far, therefore, as the board attempted to make a conditional order in such a proceeding, its action was unauthorized and nugatory. But it is contended that the holding in the *Frank* case that the adjudication may be upheld with the *ultra vires* conditions eliminated is erroneous and should be set aside. In *Shaw v. Kellogg*, 170 U. S. 312, the controversy was one with respect to the title to a large tract of land in New Mexico; it being contended it was mineral land subject to entry. A congressional grant provided that the land should be selected by the grantees, and that it should be vacant and nonmineral. The land was settled by the claimants, and the selection reported to the land department by the surveyor general of New Mexico, whose duty it was to make the survey and see that the lands were such as the grantees were entitled to select. The land department approved the survey, field notes, and plat, and noted on its maps that the land had been segregated, but the certificate of approval entered upon the plat filed in the land department by the surveyor general, under the directions of that department, made the approval "subject to the conditions and provisions of section 6 of the act of congress, approved June 21, 1860." This is the act making the grant and providing that the land shall be "not mineral" in character. The court held that the limitation was beyond the power of the land department to impose, and that the title was valid and not affected by the limitation, saying: "What is the significance of, and what effect can be given to, the clause inserted in the certificate of approval of the plat that it was subject to the conditions and provisions of the act of congress? We are of opinion that the insertion of any such stipulation and limitation was beyond the power of the land department. Its duty was to decide and not to decline to decide, to execute and not to refuse to execute the will of congress. It could not deal

with the land as an owner and prescribe the conditions upon which title might be transferred. It was agent and not principal. Congress had made a grant, authorized a selection within three years, and directed the surveyor general to make survey and location, and within the general powers of the land department it was its duty to see that such grant was carried into effect and that a full title to the proper land was made. Undoubtedly it could refuse to approve a location on the ground that the land was mineral. It was its duty to decide the question—a duty which it could not avoid or evade. It could not say to the locator that it approved the location provided no mineral should ever thereafter be discovered, and disapproved it if mineral were discovered; in other words, that the locator must take the chances of future discovery of minerals. It was a question for its action and its action at the time." See, also, *Deffeback v. Hawke,* 115 U. S. 392, 406, where it is said: "The land officers, who are merely agents of the law, had no authority to insert in the patent any other terms than those of conveyance, with recitals showing a compliance with the law and the conditions it prescribed." By a parity of reasoning, the only authority which the state board had was to adjudicate the validity of the claims filed and determine their priority, under sections 15 to 27, inclusive, of the act. This being done, its powers and duties in the matter before it were ended, and it had no power to impose conditions, no application for unappropriated water being before it for consideration.

Much is said in the plaintiffs' briefs upon the proposition that the powers and duties of the board are administrative in character, and the point is sought to be made that controversies between rival appropriators are not within the scope of its powers and duties. This may be granted, and, yet, it cannot help the plaintiffs here. The board was authorized under the statute to fix a time for determining the claims of all persons to the waters of the North Platte river which had become vested prior to April, 1895. Notice was given of the time and place of

the hearing. All the parties to this suit or their predecessors in interest appeared. The board examined their claims, passed upon their validity, and fixed their priorities. This was absolutely essential for its own information in order that it might administer and distribute the unappropriated waters. By its rules it provided for the contest of claims made, and for a hearing upon the same, and for appeals from the decision of the secretary and board upon such contests. No contests being made as to the rights of any claimant, and no appeal being taken as to the amount and priority of appropriations, the matter became settled, so far as the board was concerned, and in its future dealings with the waters of the river it was bound to follow the adjudications made and distribute the same in accordance therewith. The supreme court of Wyoming in *Ryan v. Tutty*, 13 Wyo. 122, 78 Pac. 661, in passing upon the statute of that state, which grants powers to water commissioners and superintendents to regulate the use of waters by different appropriators according to their priorities, and provides that from the decision of such officers an appeal lies to the state engineer, and from his decision to the circuit court, while holding that a decision of the commissioner and superintendent as to the right or use of water, although not appealed from, is not an adjudication conclusive on the courts, say: "But it is to be observed that the statute clearly contemplates that such official action shall be based *upon a record of adjudicated priorities*. They (the officers) are not vested with arbitrary control, but are required to divide the water according to the prior rights of the interested parties. * * * Primarily, the commissioner is authorized, whenever legally called upon, and it is his duty, to see that the water of a particular stream is diverted *in accordance with the established priorities, and* to prevent any one from taking more water than he is entitled to take to the injury of others. He is not authorized to determine priorities. * * * The only object of his inquiry is that he may justly and fairly make a temporary distribution of

the water *in conformity with the adjudicated priorities."*
(The italics are ours.)   It will be seen, therefore, that
the question involved here is not decided in that case ad-
versely to the views of this court, though it is cited by
plaintiffs as upholding their contention.   *Boulder & Left
Hand Ditch Co. v. Hoover,* 48 Colo. 343, 110 Pac. 75.   The
same principle was announced by this court in *Farmers
& Merchants Irrigation Co. v. Cozad Irrigation Co.,* 65
Neb. 3.

In considering whether the appropriation had been lost
by lack of diligence, by nonuser or abandonment these
facts must be considered.   The stipulation shows that
prior to June 1, 1893, about $96,000 had been expended
upon the canal.   It was then of sufficient capacity to ir-
rigate 30,000 acres of land within a distance of 19 miles
from the headgate.   The 25 miles below the 19 miles men-
tioned had been opened up at various places to a full
depth, and nearly one-fourth of the construction work per-
formed, but had not been connected up with the 19-mile
section in which water was flowing.   The canal was kept in
repair until in 1898 by the Farmers Canal Company, and
thereafter by landowners along the canal with the consent
of that company, until it was taken possession of by the
Tri-State Land Company.   Up to the time of the fore-
closure of the trust deed the company endeavored to sell
additional bonds or to exchange them with different con-
tractors for the purpose of extending and finishing the
canal.   The action to foreclose the trust deed securing the
bonds was commenced in 1898, on December 23, 1901, the
property was sold, and the sale was confirmed in February,
1902.   On April 14, 1902, Frank filed his claim, which,
if allowed, would have destroyed the appropriation except
for water sufficient to irrigate 5,000 acres.   This was fol-
lowed by the claim and intervention of the Farmers Irri-
gation District, which, if allowed, would have had the
same effect.   Protests against Frank's application were
filed on behalf of Roberts Walker claiming the prior ap-
propriation.   These proceedings before the board and by

appeal to the district and supreme courts continued until November 18, 1904, when they were terminated by the judgment of the district court in pursuance of the 'man-date. This recites: "The findings and jurisdiction of the state board of irrigation, in so far as it finds the said Roberts Walker as the successor in interest of the Farm-ers Canal Company entitled to an amount of water from the North Platte river not to exceed 1,142 6-7 cubic feet per second of time, is hereby ratified and affirmed." And it was adjudged that Roberts Walker "has appropriated and is entitled to divert from the North Platte river for irrigation purposes 1,142 6-7 cubic feet of water per second of time, and has a vested, subsisting right in and to said appropriation." The Tri-State Company was organized in January, 1904. In February, 1904, it made a contract with Roberts Walker to purchase the Canal Company's property, the amount to be paid depending upon the result of the litigation. Relying upon the judgment, the Tri-State Company paid the full amount stipulated for the rights of Roberts Walker, and received a conveyance of the property, which was recorded on February 21, 1905, in the office of the register of deeds in Scott's Bluff county. It immediately began the enlargement and construction of the canal, expending over $100,000 that year. It pur-sued this work in 1906, and diligently and actively pr.ise-cuted the work until its completion, so that the canal is now capable of furnishing water for the entire 80,000 acres of land which it was constructed to serve. On Sep-tember 13, 1906, it made an application to the state board for leave to construct a needle dam across the river below the headgate of its canal. That it had a valid existing right was recognized by the state board at that time, when it granted leave to construct a needle dam in the river be-low its headgate for the purpose of diverting sufficient water into its canal, and this right has been since recog-nized by that body in its administration of water from the river.

It seems evident that the purpose to carry on the enter-

prise and construct the canal in its entirety was never abandoned by the owners, and it has now been carried to completion. It is probably true that no actual construction work was performed upon the canal for about 10 years; but, from the time that the foreclosure suit was begun until the final decision in the *Frank* case, the title to the property and right to the appropriation were in such hazardous and uncertain condition that few men would have had the temerity to invest money to any extent in the further development of the plan. The enterprise was of such a nature as to require large expenditures and years of effort. While recognizing the rule that in the final analysis it is the application of water to a beneficial use within a reasonable time that conditions the power of the appropriator to retain his right to carry water, and that an appropriator of water to be carried to be used by others must carry on his works with diligence or lose his priority, we are convinced that, under all the facts in this case, it would be highly inequitable and unjust at this time to enforce a forfeiture on the ground of lack of diligence, nonuser or abandonment. We are aware that it has been said that pecuniary difficulties are no excuse for failure to carry on such work, but an examination of the cases in which this doctrine has been laid down shows that the facts are so dissimilar from the case at bar that we do not feel justified in adopting them as forceful authority in this case. This precise question may never arise again in this state, for by an amendment made in 1911 to section 18, ch. 93*a*, Comp. St., a time is specifically limited for the application of water, and a method of procedure established by which the question of nonuser or lack of diligence is determined.

Upon the question whether, even if the other questions be decided in favor of plaintiffs and against defendants, plaintiffs are entitled to the aid of a court of equity and are not estopped by reason of their own conduct, it is necessary to examine the facts as admitted by the pleadings and the evidence. All parties who took any part in

the hearing knew, or were charged with knowledge, that notices had been posted by the Farmers Canal Company and recorded in the office of the county clerk prior to the taking effect of the act of 1895. The act of 1889, by authorizing such filing and recording, constituted the same a public record, of which all persons interested were bound to take notice. These notices showed that the Farmers Canal Company, by the first, claimed a quantity of water sufficient to fill a canal 40 feet wide on the bottom and to carry water to a depth of 4 feet, and, by the others, water in addition to its former claim to the amount of 200,000 miner's inches, the canal to be 80 feet wide and 8.84 feet deep at point of divergence, slope 1 to 1, with an average grade not greater than 2 feet to the mile. Under section 32 of the act of 1895, 50 miner's inches shall be deemed equivalent to a cubic foot of water per second, so that in the aggregate the waters claimed largely exceeded in quantity the 1,142 6-7 cubic feet per second which were allowed. Indeed, we find no specific denial of this knowledge either in the pleadings or the evidence. After denying knowledge of the filing of the claim of the Farmers Canal Company with the board, of the hearing thereon, and of the opinion and resolution, the petition alleges: "Nor did the plaintiff herein or its grantor acquire any knowledge whatever of *the above mentioned transactions of said board* and its secretary for several years *after they had taken place.*" This is not a negation of knowledge of the claims of the Farmers Canal Company, but only of knowledge of the transactions of the board. It also amounts to an admission that it acquired knowledge "several years after" 1896 and 1897, when the transactions mentioned took place. The expression "several years after" is vague and indefinite, and, since the language used must be construed most strongly against the pleader, it cannot we think be taken to mean a space of about nine years from July, 1896, when the hearing was had, and January, 1897, when the resolution passed, and the time when the defendants began the work of recon-

struction and enlargement on a large scale in August, 1905. So that there is no denial of want of knowledge even of the board's action before the latter time.

The petition alleges that the defendants "have, through their duly authorized officers and agents, at various times asserted and declared that they have a right of appropriation of water from the North Platte river to the extent of 1,142 6-7 cubic feet per second of time * * * which is prior to the right of appropriation acquired by this plaintiff." The time at which these declarations were made is not disclosed. But, if only recently made, the pleader would, no doubt, have taken advantage of the fact. The evidence also shows the mailing of notices and of printed rules of procedure to the plaintiffs, and that at different dates from June 24 to October, 1895, the plaintiff's grantor and ten other claimants, including the Farmers Canal Company, filed claims before the state board, and that on July 17, 1896, another claim was filed by the owners of the Minatare ditch. On the same day that the opinion on Farmers Canal Company was filed by the secretary, he also filed opinions in the claim of the Enterprise Ditch Company, plaintiff's grantor, and in those of three of the other plaintiffs. It is apparent, therefore, that all claimants who filed claims with or produced evidence before the board had notice of its transactions, at least to the extent of being aware that a hearing would be had, and were also charged with notice of the rules of practice adopted by the board. The evidence also shows that some rehearings, presumably on request, were had upon claims. In April, 1902, the Frank application was filed with the state board. In June, 1902, the Farmers Irrigation District also filed a like application. These applications were contested before the board, appeal was taken to the district court and supreme court. Judgment was rendered on June 9, 1904, in favor of the Farmers Canal Company upholding its prior right to the appropriation it claims. In 1905 the Tri-State Land Company expended $133,066.46 in their work on the canal. In August, 1906, it began work on the

enlargement of the 19-mile portion of the canal. In the spring of 1907 the canal was constructed to its full size for a distance of 40 miles below the headgate. In September, 1906, it was given leave by the state board to construct a needle dam across the river below the headgate. and this work was begun in October of that year. In all there was expended in 1906 in these operations the sum of $499,491.87. In 1907 a new headgate was built and the canal further extended at an aggregate cost of $323,386.87. In 1908 the work was continued at a cost of $52,410.67. In 1909 $464,535.13 was expended in extension and improvement. In 1910 work was continued on the headgates, needle dam, and waste gate at a total cost of $198,529.70. The total amount expended by the Tri-State Company in construction from February, 1905, to October 31, 1910, was $1,651,138.41, of which amount over $950,000 was expended before the original petition in this case was filed.

The question is whether the plaintiffs could stand idly by while the defendants, openly claiming a prior right to water sufficient to water the lands for which the appropriation had been allowed by the state board, expended nearly a million dollars in the work, and then after the work was practically finished enjoin the use of the water which the works were constructed to carry. Under section 10 of the act of 1895, the state board is required to prepare and render to the governor biennially full reports touching all the matters and duties devolving upon the board by virtue of its office, and it is provided that 2,000 copies of the report should be printed and distributed according to the provision of the law providing for the printing of other state reports. This report is a public document of which we take judicial notice. The report for the years 1897 and 1898 contains a table showing the appropriations from the various streams of the state which had been allowed by the board since its organization in 1895, with the date of priority, and the amount adjudged to each appropriator. This table shows

that the Farmers Canal Company of Omaha had been granted an appropriation of 1,142.87 second feet, with headgate located on section 3, town 2, range 58, Scott's Bluff county, with priority of September 16, 1887, with the conditions mentioned, and also shows the amount and priorities awarded other parties to this suit. This table is carried forward in each report published, so that the information therein contained has been available to all parties interested ever since early in the year 1900 until the present time. With all these facts before us, we must find that plaintiffs had knowledge of the posted and recorded claims of the Farmers Canal Company; of the passage of the law of 1895, and of its provisions requiring the state board at its first meeting to make arrangements for adjudicating the priorities of all "claims for appropriation now on record;" of the notice to appear before the secretary, and of the rules prescribed by the board as to rehearing, appeals, and contents; of the practice of the board in deciding claims by written opinions, copies of which were mailed to each claimant; of the fact admitted in its reply that ever since the Tri-State Land Company became the owner of the canal, "it claimed and still claims the right to 1,142 6-7 cubic feet per second;" of the vast undertaking of the defendants in the completion of the canal; of the extensive works of the Tri-State Company in building dams and headgates, and in excavation, comparable only to the construction of a railroad; and of the expenditure of hundreds of thousands of dollars in a sparsely settled country. Furthermore, the claims of all the parties except two originated by posting notices on the bank of the stream and recording copies in the office of the county clerk. When the state sought to determine for its own purposes the rights to the use of water which had vested, so that it might apportion that which still flowed in the river bed subject to appropriation, it gave all of these claimants an equal opportunity to assert their claims. They all took advantage of this privilege, their rights were determined, and they all

acquiesced.   Opportunity for contests of the claims of others which might interfere with the amount of water each claimed was afforded each of them under the rules adopted which were brought to their attention.   They filed no contests, took no appeals, but remained apparently content to recognize the authority of the board.   Relying on these conditions, as well as upon the adjudication, the defendants purchased the canal, worked upon it for years, and spent vast sums of money in its completion so as to irrigate the specific land which it was originally designated to reclaim.   During all these years no claim of superior right to this water seems to have been made, though it must be said that, when the supply was short and while the defendants were not using the water, it was used by some of the plaintiffs, but this is customary, right and proper when water is flowing in the stream unused.   If a prior appropriator for carriage is not ready to use water, the use of it by another is not equivalent to an adverse user which of itself would give notice of a hostile claim.   *Smith v. Duff,* 39 Mont. 374, 102 Pac. 981 ; *Featherman v. Hennessy,* 42 Mont. 535, 113 Pac. 751 ; *Ison v. Sturgill,* 57 Or. 109, 109 Pac. 579; *Weidensteiner v. Mally,* 55 Wash. 79, 104 Pac. 143.   Under these circumstances, and having this knowledge, it would be contrary to the plainest principles of equity if plaintiffs might stand silently by, seeing the defendants engage in such a monumental work under claim of right, and utter no word of warning as to their own claims, which, if eventually established, would deprive defendants of the water which the canal was built to carry, condemn the whole enterprise to failure, and result in the absolute loss of the money expended.   It would be manifestly inequitable and unjust to allow the plaintiffs, after the works were practically finished and the money expended, to insist upon claims which, had they been asserted in good time, would at least have put the defendants upon their guard and have given them cause to pause and hesitate in their expenditures until the validity of their title had been determined.

In *Fremont Ferry & Bridge Co. v. Dodge County,* 6 Neb. 18, the facts were that the company sought to enjoin the county from erecting a bridge which would take away tolls from a bridge built by plaintiffs. It was shown by the answer that a bridge had been erected by the county, a part of which was out of repair, and which it was about to repair. The court said: "The silence of the plaintiff when knowing its own rights, and having full knowledge of the steps taken by the defendants to build the bridge, will estop it after the completion of the work, or after large expenditures of money in construction had been made; for such silence lulls to rest instead of warning to danger, and, in the language of the books, it becomes a fraud." In a case where a mill owner entitled to the use of water as a riparian owner remained quiescent while an irrigation company expended large sums in constructing its canal, this court refused to grant an injunction against the use of the water for irrigation, saying: "It is clearly established by the proofs that the construction of the irrigating ditch was undertaken and carried out by the defendant company in good faith in accordance with the purpose of its creation, at a cost of many thousands of dollars, and in the belief on the part of its promoters and managing officers that it was entitled to divert the water of the Republican river. It is also practically undisputed that the plaintiff was from the first fully advised of both the undertaking and the purpose of the defendant, and it is certain that he interposed no objection thereto until after the substantial completion of the work. The rule which denies relief in equity to one who has slept upon his rights applies in all its force to cases where the defendant is engaged in a work of public interest. In fact there is no principle more firmly established in the jurisprudence of this country than that a suitor who has by his laches made it impossible to restrain the completion or use of public works without great injury to his adversary or the public will be left to pursue his ordinary legal remedies." *Clark v.*

*Cambridge & Arapahoe I. & I. Co.*, 45 Neb. 798. See, also, cases cited in each of these opinions. *New York City v. Pine*, 185 U. S. 93, 22 Sup. Ct. Rep. 592. We think the cases cited by plaintiffs are so different in the facts before the court that they do not furnish any guide in this case. Whether the original adjudication was more than a mere administrative proceeding for the information of the board or not, and even if it should be held that the right to the full appropriation was lost by nonuser before the Tri-State Land Company fully constructed its canal, we agree that the plaintiffs are estopped to maintain this action.

In concluding, we may remark that the evidence shows that at the time the state board made the determinations agriculture by irrigation was in its infancy in this state. The volume of water flowing in the North Platte river at various seasons of the year had not been definitely ascertained, and the actual flow was largely a matter of conjecture. A number of the determinations made, therefore, were for water in excess of the actual amount which experience has shown was available for the respective enterprises and which the works could convey. Perhaps this fact should be considered by the state board in times of scarcity, but this question was not presented, and is not decided. The true test of ultimate right to the water is its actual application to a beneficial use. The spirit and the letter of the statute compels the most rigid economy in the use of water so that the full benefit of it may be derived. If not in use by prior appropriators, others may use it. No dog in the manger policy can apply. If the nonuse is continued for the statutory time the right ceases, may be forfeited, as the statute provides, and more diligent users may acquire the right to its use under the authority of the board. A landowner taking more than he is entitled to is liable in damages to those injured. No appropriator is entitled to more than can be beneficially used, or more than the least amount which experience indicates is necessary for the production of crops in the exercise of good husbandry.

We find it unnecessary to consider the questions presented as to the rights of the plaintiffs and cross-petitioners between each other, since the result reached eliminates the same.

The judgment of the district court is reversed and the cause dismissed, but without prejudice as to any controversy between the plaintiffs and cross-petitioners.

REVERSED AND DISMISSED.

HAMER, J., concurring in part, and dissenting in part.

I concur in the opinion so far as it reverses the judgment of the district court, and no further. I am unwilling to adopt the views expressed in the opinion, and dissent from them. I am unwilling that the case shall be dismissed, and dissent from so much of the opinion as directs its dismissal. Only that amount of water should be adjudged to the main ditch which can be applied to a beneficial use. The amount of water applied should be with due regard to the rights of other appropriators, and where the first appropriator fails to apply all the water within the limits of his appropriation to a beneficial use, and there is an excess of water which is not applied, the same shall be for the use of the next appropriator in the order of priority, and there should be no appropriation except for an actual beneficial use. The ditch should not be held entitled to appropriate water over and above that which is intended for an immediate beneficial use, and water not so diverted and used should belong to the next appropriators in order of priority. As between ditches, there should be a *pro rata* distribution of water based upon the amount each ditch has lawfully appropriated and applied to a beneficial use, and not exceeding the limit of each appropriation.