[No. 27231.  *En Banc.*  October 24, 1938.]

THE STATE OF WASHINGTON, *on the Relation of Forks Shingle Company, Inc., Plaintiff,* v. ALBERT C. MARTIN, *as Commissioner of Public Lands, Respondent.*[1]

*Bundy & Swale,* for relator.

*The Attorney General, L. C. Brodbeck* and *Browder Brown, Assistants,* for respondent.

GERAGHTY, J.—This is an original application for a writ of mandate requiring the respondent to receive and file in his office the relator's application for the ap-

[1]Reported in 83 P. (2d) 755.

praisal and sale of the timber on a forty-acre tract of school land, being the southwest quarter of the southwest quarter of section 16, township 27 north, range 12 west, in Jefferson county.

The relator alleges in its petition that it is a corporation organized under the laws of the state of Washington, and eligible to make application for the purchase of granted lands, or the timber thereon, under the provisions of existing laws; that the described tract is part of the lands granted to the state by the United States for the support of the common schools under the provisions of § 10 of the enabling act, providing for the admission of the state into the Union; that the land is chiefly valuable for its timber, the stand of which is in excess of one million feet per quarter section; and that it is for the best interests of the state to sell the timber apart from the land. It is alleged that the respondent assigns as the ground for his refusal to accept and file the relator's application for the appraisal and sale of the timber the passage by the legislature of chapter 175 of the 1933 Session Laws, p. 682, Rem. Rev. Stat. (Sup.), § 7879-1 [P. C. § 6504-31] et seq.

The respondent has interposed a demurrer to the petition upon the ground that it does not state facts entitling the relator to the relief prayed for.

Chapter 175, Laws of 1933, which the respondent invokes to sustain his refusal to accept the relator's application, and which the relator contends is unconstitutional, is a new departure in the manner of administering the state-owned forests. Section 1, p. 682, of the act follows:

"The area of state lands embraced within townships 24, 25, 26, 27 and 28 north, ranges, 10, 11, 12, 13, and 14 W. W. M., except isolated tracts not contiguous to other tracts therein, are hereby set aside and established as 'state sustained yield forest No. 1.' All of

said lands are hereby reserved from sale and the timber thereon shall be sold under the 'sustained yield plan,' which, for the purposes of this act, is defined to mean a plan by which the yield or cut of timber is managed in such way as to permit so far as economically possible, the removal of approximately equal volume of timber annually or periodically equal to the increment. The timber of said forest shall be administered and sold in the same manner as the timber on common school lands of the state, except as otherwise provided herein." Rem. Rev. Stat. (Sup.), § 7879-1 [P. C. § 6504-31].

Section 2, p. 682, Rem. Rev. Stat. (Sup.), § 7879-2 [P. C. § 6504-32], provides for the making of a topographical survey of the forest designated in § 1 and the dividing of it into logging circles or units, with the purpose of management under the sustained yield plan, so that, as the timber on each logging circle or unit is sold and removed, the new growth of forests on the cut-over units will insure a continuous reforestation and permanent supply of timber in the forest area.

Section 3, p. 683, Rem. Rev. Stat. (Sup.), § 7879-3 [P. C. § 6504-33], provides that the timber shall be sold only by logging circles or units, and that, before the timber of any unit is offered for sale, a cruise shall be made, and the amount of timber estimated. Sales are to be made only on a stumpage basis, and after the value has been determined. No sale shall be made for less than the value so determined. Bids at the sale shall be sealed, and the award made to the highest bidder having financial ability to conduct the necessary logging operations and make the payments required. Any and all bids may be rejected. No sale shall be made except pursuant to a call for bids upon such notice as is required by law, and by notice published once a week for eight consecutive weeks in at least two

newspapers of general circulation in the state. The call for bids shall state the time, place, and manner of sale; the circle or unit upon which the timber is located; and the estimated amount of stumpage, and such other information as may be desirable.

Section 4, p. 683, Rem. Rev. Stat. (Sup.), § 7879-4 [P. C. § 6504-34], requires a written contract with the successful bidder, which shall fix the time when logging operations are to commence and be concluded and shall provide for monthly payments for the timber removed and the designation of the price per thousand feet to be paid for each species of timber; and for the adjustment of stumpage prices at intervals, though not exceeding three years. The contract is also to provide for supervision of logging operations, the methods of scaling and reporting, and such other provisions as may be deemed advisable.

Section 5, p. 684, Rem. Rev. Stat. (Sup.), § 7879-5 [P. C. § 6504-35], requires a cash deposit by the purchaser equal to ten per cent of the estimated value of the timber on the circle or unit purchased, computed at the stumpage bid.

Section 6, p. 684, Rem. Rev. Stat. (Sup.), § 7879-6 [P. C. § 6504-36], provides that the expense of administering the forest and selling the timber thereon, including the expense of examination and cruising, advertising, and supervision, shall be paid out of the gross proceeds of the timber sales.

Contending that the act is invalid, as being obnoxious upon several enumerated grounds to the provisions of the state constitution governing the management and sale of the state's granted school lands, the relator asserts a right to have its application for purchase accepted by the respondent under the provisions of chapter A, Title 51, Rem. Rev. Stat., §§ 7797-1

to 7797-201 [P. C. §§ 6334-11 to 6334-211], inclusive (chapter 255, Laws of 1927, p. 468).

As the respondent justifies his refusal to accept the application by reference to chapter 175, Laws of 1933, p. 682, it may be assumed that, but for the passage of that act, the application would be accepted and given consideration in due course, in accordance with the practice of the land department.

The relator urges five constitutional objections to the validity of the act. It is urged first that the provision contained in § 2 of the act, for dividing the area into logging circles or units, violates § 4 of Art. XVI of the constitution, which provides that no more than 160 acres of any granted lands of the state shall be offered for sale in one parcel. It is contended that, while the act does not specifically prescribe the extent of the units, they must necessarily be of greater extent than 160 acres; but that, in any event, it is possible under the law to establish units of greater extent, and that this possibility makes the provision unconstitutional.

It is next contended that the provisions of the act regulating the sale of timber are violative of the provision of the constitution requiring all sales to be made at public auction to the highest bidder.

The third objection made to the act is based upon the provision requiring insertion in the contract of sale of a stipulation for the adjustment of stumpage prices at intervals of not less than three years. It is contended that this provision violates the constitutional requirement of a sale to the highest bidder.

The fourth contention is that the provisions of the act for payment of stumpage on monthly estimates is contrary to § 1 of Art. XVI of the constitution, providing that no sale of land shall be made unless its full market value be paid or safely secured to the state.

Finally, it is contended that § 6 of the act, in providing that all expenses of advertising the forest and selling the timber shall first be paid out of the gross proceeds of the sale, violates § 3 of Art. IX of the state constitution, which provides that the proceeds of the sale of timber, minerals, or other property from school and state lands, shall become part of the common school fund, which is to remain permanent and irreducible.

The pertinent provisions of the constitution follow:

"The principal of the common school fund shall remain permanent and irreducible. The said fund shall be derived from the following named sources, to wit: . . . the proceeds of the sale of timber, stone, minerals, or other property from school and state lands, other than those granted for specific purposes; . . . the principal of all funds arising from the sale of lands and other property which have been and hereafter may be granted to the state for the support of the common schools. . . ." § 3, Art. IX.

"All the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interests disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; nor shall any lands which the state holds by grant from the United States (in any case in which the manner of disposal and minimum price are so prescribed) be disposed of except in the manner and for at least the price prescribed in the grant thereof, without the consent of the United States." § 1, Art. XVI.

"None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; and the value thereof, less the improvements, shall, before any sale, be appraised by a board of appraisers, to be provided by law, the terms of payment also to be prescribed by law, and no sale shall be valid unless the sum bid be equal to the appraised value of said land. In estimat-

ing the value of such lands for disposal, the value of improvements thereon shall be excluded: Provided, that the sale of all school and university land heretofore made by the commissioners of any county or the university commissioners, when the purchase price has been paid in good faith, may be confirmed by the legislature." § 2, Art. XVI.

"No more than one-fourth of the land granted to the state for educational purposes shall be sold prior to January first, eighteen hundred and ninety-five, and not more than one-half prior to January first, nineteen hundred and five; Provided, that nothing herein shall be so construed as to prevent the state from selling the timber or stone off of any of the state lands in such manner and on such terms as may be prescribed by law: And provided further, that no sale of timber lands shall be valid unless the full value of such lands is paid or secured to the state." § 3, Art. XVI.

"No more than one hundred and sixty acres of any granted lands of the state shall be offered for· sale in one parcel, and all lands within the limits of any incorporated city, or within two miles of the boundary of any incorporated city, where the valuation of such lands shall be found by appraisement to exceed one hundred dollars per acre shall, before the same be sold, be platted into lots and blocks of not more than five acres in a block, and not more than one block shall be offered for sale in one parcel." § 4, Art. XVI.

Section 3 of Art. XVI, quoted above, answers, we think, all of relator's objections to the act. The section, after limiting the amount of land granted for educational purposes to be sold prior to the year 1905, provides:

" . . . nothing herein shall be so construed as to prevent the state from selling the timber or stone off of any of the state lands in *such manner* and on *such terms* as may be prescribed by law: . . ." (Italics ours.)

We are unable to agree with the relator that the scope of the proviso is limited to the section in which

it is found. The plain import of the proviso is that, while the section limits the amount of land to be sold prior to the year 1905, this limitation is not to be so construed as to prevent the state from selling the timber or stone off any of the state lands on terms to be prescribed by law. It would be a narow and illogical construction of the proviso to hold that it related only to the sale of timber or stone upon the granted lands withheld temporarily from sale.

No particular lands are directed to be withheld from sale, the restriction being that no more .than one-quarter of the land should be sold prior to 1895, and no more than one-half prior to 1905. The proviso necessarily affected all of the lands granted for educational purposes.

While the sale of more than one-half of the lands within the designated period is forbidden, there is no provision in the constitution requiring the state to dispose of its granted lands. The state is free to retain title to its timber lands granted for support of the schools and market the timber crop growing on them as it matures. The constitution recognizes the possible sale of timber and other material on granted lands as a source of revenue apart from the sale of the land itself. This is seen in § 3 of Art. IX, which, in enumerating the sources of the permanent school fund, mentions the proceeds of the sale of timber from school and state lands other than those granted for specific purposes, and then specifies as another source the principal of all funds arising from the sale of school lands. It was to make certain that the restriction on the sale of lands granted for educational purposes, contained in § 3 of Art. XVI, should not be held to limit the right of the legislature to provide for the sale of timber or stone, that the proviso was inserted.

The rule that every intendment is to be indulged to

sustain the validity of a law passed by the legislature, is applicable here with particular force, where the challenged act is one highly remedial, having for its purpose the conservation of the state's forest resources. We are of the opinion that the legislature did not over-step its constitutional power in the enactment of the challenged legislation.

■ The refusal of the respondent to accept the relator's application was justified upon another ground. Section 1 of the act, in express terms, reserves from sale the state lands and timber in the five townships specified, and declares that the timber on these lands shall be sold under the sustained yield plan, meaning a plan

". . . by which the yield or cut of timber is man-aged in such way as to permit, so far as economically possible, the removal of approximately equal volume of timber annually or periodically equal to the in-crement. . . ."

Now, this is a definite mandate to the land commis-sioner, which he is required to obey. There is nothing in this mandate that is beyond the power of the legis-lature. Even if some of the features of the plan embodied in succeeding sections of the act for disposal of the timber were subject to objection on constitu-tional grounds, this should not defeat the declared policy of the legislature to reserve the timber from present sale, for disposal under some other plan free from constitutional objection.

The writ is denied.

STEINERT, C. J., MAIN, BEALS, BLAKE, ROBINSON, and SIMPSON, JJ., concur.

MILLARD, J., (dissenting)—The Forks Shingle Com-pany tendered the statutory fee of ten dollars and presented in due form to the commissioner of public

lands its application to purchase the timber on the southwest quarter of the southwest quarter of section 16, township 27 north, range 12 west, in Jefferson county, Washington, which land is a part of the land granted by the United States to the state of Washington for the support of the common schools. On the ground that, under the provisions of chapter 175, Laws of 1933, p. 682, Rem. Rev. Stat. (Sup.), § 7879-1 [P. C. § 6504-31] *et seq.*, the timber on the land in question is not subject to sale, the commissioner refused to receive the application, whereupon this original mandamus proceeding was instituted to compel the commissioner to accept and file the relator's application to purchase the timber.

If it were not for chapter 175, Laws of 1933, the constitutionality of which is challenged by counsel for relator on a number of grounds, it would be the duty of respondent commissioner, under the provisions of the public lands act (chapter A, Title 51, Rem. Rev. Stat., §§ 7797-1 to 7797-201 [P. C. §§ 6334-11 to 6334-211]) to accept and file the relator's application.

Chapter 175, Laws of 1933, provides for the sale of timber, under the "sustained yield plan," on state lands. Section 1 of the act, p. 682, Rem. Rev. Stat. (Sup.), §7879-1 [P. C. § 6504-31], describes the state lands which are set aside and established as "state sustained yield forest No. 1." All of the lands described *"are hereby reserved from sale and the timber thereon shall be sold under the 'sustained yield plan,'* . . . " (Italics mine). That is, *an interest*—the timber thereon—*in the land is reserved for sale under a new plan.* This new, or "sustained yield plan," is a plan by which the yield or cut of timber is managed in such a way as to permit, so far as economically possible, the removal of approximately equal volume of timber annually or periodically equal to the in-

crement. Section 1 further provides that the timber shall be administered and sold in the same manner as the timber on common school lands of the state.

Section 2, p. 682, Rem. Rev. Stat. (Sup.), § 7879-2 [P. C. § 6504-32], provides for the division of the forest into logging circles or units, with the object in view that the forest shall be managed under the sustained yield plan; and that, as the timber on each logging circle or unit is sold and removed, the growth of new forests on the cutover units will insure a continuous reforestation and permanent supply of timber in the forest area.

Section 3, p. 683, Rem. Rev. Stat. (Sup.), § 7879-3 [P. C. § 6504-33], provides for the sale of the timber only by logging circles or units. Sales shall be made only on the stumpage basis after a determination of the stumpage value. No timber may be sold for less than the determined stumpage value. Bids for purchase of the timber

". . . shall be sealed and the award shall be made to the highest bidder having financial ability to conduct the necessary logging operations and make the payments required. . . ."

All bids may be rejected and no sale may be made except pursuant to a call for bids after required notice has been given.

Under Section 4, p. 683, Rem. Rev. Stat. (Sup.), § 7879-4 [P. C. §.6504-34], the successful bidder is required to enter into a contract with the commissioner of public lands, which contract fixes the period when the logging operations shall be commenced and concluded and the manner and times in which all payments must be made. The contract shall also provide for adjustment of stumpage prices at intervals of not to exceed three years.

Section 5, p. 684, Rem. Rev. Stat. (Sup.), § 7879-5

[P. C. § 6504-35], provides for a cash deposit of ten per cent of the purchase price, which must be made by the successful bidder at the time of the execution of the contract.

Section 6, p. 684, provides that

"The expense of administering said forest and selling the timber thereon, . . . shall be paid out of the gross proceeds of the timber sales. . . ." Rem. Rev. Stat. (Sup.), § 7879-6 [P. C. §6504-36].

Counsel for relator contend that the provisions of chapter 175 of the Laws of 1933 for the division of the area into logging circles or units offends against § 4, Art. XVI of our constitution, which provides that no more than one hundred sixty acres of any granted lands of the state shall be offered for sale in one parcel.

It is argued that, while the statute does not specifically provide for the creation of units in excess of one hundred sixty acres, it is clear from the language of the act that such was the intent. Our attention is directed to the provision for the adjustment of stumpage prices at intervals of not more than three years, and it is then argued that we will take judicial notice of the fact that no logging operation of practical extent could possibly consume three years in the logging of one hundred sixty acres.

It is not necessary to concede that the plan embodied in the statute would not be workable if the logging units were limited to areas of one hundred sixty acres. The statute does not contain any language limiting the area; therefore, under the statute, areas in excess of one hundred sixty acres are authorized, which is violative of § 4, Art. XVI of the constitution.

We may not indulge in the presumption that the department would limit the area of the logging units to one hundred sixty acres and sustain the statute on the assumption.

In holding in *Northern Cedar Co. v. French,* 131 Wash. 394, 230 Pac. 837, that the constitutionality of an act is to be determined by what the act affirmatively permits and not by what action an administering officer may or may not take, we said:

"It is further argued that, since the state and national constitutions demand that property may not be taken without notice and that such is the settled law, the courts will assume that the legislature intended that notice should be given, unless its act expressly or by necessary inference demands the contrary conclusion, and that, since there is nothing of that character in this act, we will read into it a notice requirement, or will assume that the director of agriculture will comply with the general law and give an opportunity for a hearing.

"An argument which in theory is just as plausible, and in practice more so, is that, since everybody knows that a legislative act is presumed to be constitutional until the courts declare to the contrary, the director of agriculture will do the natural thing and follow the authority given him by the legislative act and annul licenses without notice.

"When courts are considering the constitutionality of an act, they should take into consideration the things which the act affirmatively permits, and not what action an administrative officer may or may not take.

"The authorities on this question are in conflict. Those at least to some extent supporting the view of the appellants are: *State v. State Medical Examining Board,* 32 Minn. 324, 20 N. W. 238; *Baltimore & Ohio R. Co. v. Pittsburg, W. & K. R. Co.,* 17 W. Va. 812; *Enterprise Irrigation District v. Tri-State Land Co.,* 92 Neb. 121, 138 N. W. 171. In the last cited case, the court said:

" '. . . we are of the opinion that where a statute under the police power of the state authorizes a proceeding affecting the property rights of any person, and does not expressly provide for notice to be given, the right to notice is implied, and that where a proper notice has been given, under a procedure authorized by the legislature, and a party has appeared, he has not

been deprived of any of his rights without due process of law.'

"In the second case cited, the court held that:

" 'Where a statute authorizes a legal proceeding against any one, and does not expressly provide for notice to be given, it is implied that an opportunity shall be afforded him to appear in defense of his rights, unless the contrary clearly appears.'

"But the weight of authority and better reason seems to be to the contrary.

"In *Stuart v. Palmer, supra* [74 N. Y. 183], the court said:

" 'It is not enough that the owners may by chance have notice, or that they may as a matter of favor have a hearing. The law must require notice to them, and give them the right to a hearing and an opportunity to be heard. It matters not, upon the question of the constitutionality of such law, that the assessment has, is fact, been fairly apportioned. The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done.' "

The limitation of § 4, Art. XVI, state constitution, that no more than one hundred and sixty acres of any granted lands of the state shall be offered for sale in one parcel, applies to sales of timber apart from the land.

Counsel for relator next insist that the provisions of chapter 175, Laws of 1933, for sale of the timber upon sealed bids to the highest bidder "having financial ability to conduct the necessary logging operations and make the payments required," violates the constitutional provision requiring all such sales to be made at public auction to the highest bidder.

The pertinent sections of Art. XVI of the state constitution read as follows:

"§ 1. DISPOSITION OF.—All the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein,

shall ever be disposed of unless the full market value of the estate or interests disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; nor shall any lands which the state holds by grant from the United States (in any case in which the manner of disposal and minimum price are so prescribed) be disposed of except in the manner and for at least the price prescribed in the grant thereof, without the consent of the United States.

"§ 2. MANNER AND TERMS OF SALE.—None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; and the value thereof, less the improvements, shall, before any sale, be appraised by a board of appraisers, to be provided by law, the terms of payment also to be prescribed by law, and no sale shall be valid unless the sum bid be equal to the appraised value of said land. In estimating the value of such lands for disposal, the value of improvements thereon shall be excluded: Provided, that the sale of all school and university land heretofore made by the commissioners of any county or the university commissioners, when the purchase price has been paid in good faith, may be confirmed by the legislature.

"§ 3. LIMITATIONS ON SALES.—No more than one-fourth of the land granted to the state for educational purposes shall be sold prior to January first, eighteen hundred and ninety-five, and not more than one-half prior to January first, nineteen hundred and five: Provided, that nothing herein shall be so construed as to prevent the state from selling the timber or stone off of any of the state lands in such manner and on such terms as may be prescribed by law: And provided further, that no sale of timber lands shall be valid unless the full value of such lands is paid or secured to the state."

Section 2, Art. XVI, provides that none of the granted lands shall be sold otherwise than at public auction to the highest bidder. A sale by sealed bids as provided by the statute is not a sale at public auction as required by the constitution. Successive, competitive bidding,

which is the essence of an auction, is wholly lacking in a sale by sealed bids.

Section 1, Art. XVI, of the constitution provides that none of the public lands "nor any estate or interest therein" shall ever be disposed of unless the full market value of the estate or interests disposed of be paid or safely secured to the state.

Section 2 of the same article provides that

"None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; . . ."

The clause "nor any estate or interest therein" in § 1, is not present in § 2. It may not be successfully urged, however, that because of the absence of that clause from § 2 the limitation of § 2 was not intended to apply to a sale of an interest in the land apart from the land itself.

In *Colburn v. Winchell*, 97 Wash. 27, 165 Pac. 1078, we held that the waters of a nonnavigable stream are a part and parcel of the soil over which it flows; and that such waters, being an interest in the land, could not, under § 2, Art. XVI of the constitution, be sold otherwise than at public auction to the highest bidder. After quoting §§ 1 and 2 of Art. XVI, we said:

"Under these provisions of the constitution, it will be seen that the lands granted to the state for the purpose of a scientific school are held in trust for all the people, and that none of such lands, 'nor any estate or interest therein,' shall be disposed of except in the manner there provided.

"It seems to us that the language of the constitution is too plain for construction. If the water of a nonnavigable stream is to be considered as a part of the soil and as an incident to the owner's estate in the land, a statute authorizing the appropriation by a nonriparian owner of the water of a nonnavigable stream upon state land held for educational purposes would not be in harmony with the constitutional mandate.

If the legislature can authorize the appropriation of water from a nonnavigable stream crossing land which the state holds in trust for the purpose of a scientific school, it could grant an estate or interest in the land without compensation, and in defiance of the constitutional provision which says that no estate or interest therein shall be disposed of unless the full value of the estate or interest, to be ascertained in the manner provided by law, be paid or secured to the state. It is a matter of common knowledge that the waters of a nonnavigable stream crossing a certain tract of land may, and in certain instances do, constitute its chief value, because without the water the land would be barren and unproductive."

The foregoing authority forecloses the question whether § 2, Art. XVI, of the constitution applies to the sale of standing timber, inasmuch as the right to go upon land and to remove the timber is an interest in the land.

While *Colburn v. Winchell, supra,* was overruled by *In Re Crab Creek & Moses Lake,* 134 Wash. 7, 235 Pac. 37, we reaffirmed the rule that the waters were a part and parcel of or an interest in the land over which it flowed. We said:

"The *Colburn* case squarely holds that riparian rights attach to state school lands, and this conclusion is based upon the provision of the enabling act, § 10, granting to the state sections 16 and 36 of every township for the use of public schools, and providing that such lands shall not be sold for less than ten dollars per acre, and §§ 1 and 2, art. 16, of the state constitution, which accepted these conditions. The state, after taking these lands, holds the absolute fee impressed with a trust which is not to be violated. The *Colburn* case holds that the waters of a nonnavigable ·stream upon school lands cannot be appropriated, since those waters are considered a part of the soil and are held along with the soil in trust and can only be disposed of by sale at public auction. The decision in the *Doan Creek* case does not mention the *Colburn* case and lays

down an exactly contrary rule than that followed in the earlier case. The court held in the *Doan* case that riparian rights do not attach to school land until it has been sold to a private owner, applying the same rule as is applied to Federal lands. There is no discussion of the question in the *Doan* case, but the rule can find argument in its favor on the theory that art. 21 of the state constitution, whereby there are dedicated all the waters of the state to the public for the purpose of irrigation, is in conflict with the enabling act and §§ 1 and 2, of art. 16, and that where a conflict exists between the constitution and the enabling act, constitutional provisions prevail. *Romine v. State,* 7 Wash. 215, 34 Pac. 924; 12 C. J. 699. Further, that if there were nothing but the provision of the enabling act and § 21, the dedication of the water of the state for the purposes of irrigation, by the constitution, would supersede the provision of the enabling act, providing that the water on state school lands should not be disposed of except as there provided.

"The conflict between article 21 and §§ 1 and 2, art. 16, of the constitution can be disposed of on the principle that, where two or more acts are in *pari materia,* the court will so construe them as to make them both effective. *Davidson v. Carson,* 1 Wash. Terr. 307; *White v. North Yakima,* 87 Wash. 191, 151 Pac. 645. Taking the two sections of the constitution together, then, the provision against the disposal of school lands, which would include the water rights, must be held to be qualified by § 21, which gives the right to acquire water on school lands by appropriation. The state has, by the later constitutional provision, waived the riparian rights to the school land by this dedication. This section of the constitution was not considered in the *Colburn* case. That case might be reversed on the ground that it was erroneous in holding that the water rights were a part of the land and to now hold that they constitute no estate or interest therein, and rule that certain privileges in connection with such land may be granted without a violation of the trust. The state has granted rights of way for public roads across school lands. Section 8087, Rem. Comp. Stat. [P. C. § 6395]. Condemnation of state school land is per-

mitted, although the constitution and enabling act provide that it shall only be sold at public auction, and it has been held that enabling act provisions and constitutional provisions such as the one here deal with the disposal of the fee and not with the granting or dedicating of lesser interests, and the *Colburn* case could be reversed on the theory that the grant of the right to appropriate water on these school lands did not involve the fee simple title to the land.

"We prefer, however, to adopt the view that the *Colburn* case was correct in its statement of the relation of water to the land, and to reverse the decision on the ground already suggested; that art. 21 of the constitution being in conflict with the enabling act and §§ 1 and 2, of art. 16, should be given the interpretation which we have given it. The result is that the state. by art. 21 and water legislation, has granted the rights which the state has in the state school lands for the purpose of irrigation to the public, and that the result is that the state's riparian rights to such lands have been waived, as long as the title remains in the state; that they attach to the lands by the transfer from the state to private ownership, thus following the rule as it relates to Federal lands."

See, also, *Elmonte Inv. Co. v. Schafer Bros. Logging Co.*, 192 Wash. 1, 72 P. (2d) 311, to the effect that a sale of standing timber, separate from the land, with the right of entry for removal within a stated time, is the conveyance of real property, and the right of reversion in case the timber is not removed within the time limited is an interest in land.

Following the rule enunciated in the *Colburn* case to the effect that the limitation of § 2, Art. XVI, of the constitution applies to the sale of an interest in the land, then the limitation of § 4, Art. XVI of the constitution limiting sales to areas not exceeding one hundred and sixty acres also applies. The *Colburn* case reads into § 2 the clause "nor any estate or interest

therein" of § 1, and under that authority the clause must be read into § 4, Art. XVI, of the constitution.

That is, standing timber cannot be sold except at public auction to the highest bidder, nor can it be sold in areas in excess of one hundred and sixty acres.

Counsel for respondent insist that, by § 3 of Art. XVI, the framers of our constitution expressed the intent to except standing timber from the limitation of § 2, Art. XVI. Section 3 places a limitation on sales. That section provides that not more than one-fourth of the granted lands shall be sold prior to January 1, 1895, and not more than one-half shall be sold prior to January 1, 1905. Following those limitations on sales is the following proviso:

"Provided, that nothing herein shall be so construed as to prevent the state from selling the timber or stone off of any of the state lands in such manner and on such terms as may be prescribed by law:  . . ."

Does "herein" in the proviso refer to § 3 of Art. XVI, or does it refer to Art. XVI as a whole?

The rules applicable in the construction of the constitution and in the construction of a statute are the same. It is an elementary rule of statutory construction that the office of a proviso is to limit or qualify the provisions immediately antecedent or those within the section or other subdivision of which the provision is a part; and in the absence of a contrary intent it will be presumed that the proviso was so intended.

"The natural and appropriate office of the proviso being to restrain or qualify some preceding matter, it should be confined to what precedes it unless it clearly appears to have been intended to apply to some other matter. It is to be construed in connection with the section of which it forms a part, and it is substantially an exception. If it be a proviso to a particular section, it does not apply to others unless plainly intended. It should be construed with reference to the immediately

preceding parts of the clause to which it is attached."
2 Lewis' Sutherland Statutory Construction (2d ed.),
673, § 352.

See, also, 25 R. C. L. 985.

In *Tabb v. Funk,* 170 Wash. 545, 17 P. (2d) 18, we
quoted with approval as follows from Sutherland,
Statutory Construction:

" 'Relative and qualifying words and phrases, gram-
matically and legally, where no contrary intention
appears, refer solely to the last antecedent.' "

If it be argued that the language in the proviso
governs, then clearly the legislature was granted the
power to sell the timber on the school lands free fram
any and all constitutional limitations. That construc-
tion makes the proviso repugnant to the body of Art.
XVI, and insofar as it is repugnant thereto, the proviso
is of no effect.

"Since the office of a proviso is not to repeal the main
provisions of the act but to limit their application,
no proviso should be so construed as to destroy those
provisions. A construction of a proviso which would
make it plainly repugnant to the body of the act
should be rejected, if possible . . . The true rule
is that a proviso or saving clause which is directly
repugnant to the purview or body of the act is inopera-
tive and void for repugnancy." 25 R. C. L. 986, 987.

See, also, 59 C. J. 1091.

In 1909, the legislature enacted a statute which
provided that, upon payment of the prescribed fee,
a license would issue authorizing the licensee to do
business for the term of one year from the date of the
license. This was followed by a proviso

"That the license issued under and by virtue of
this act shall expire by limitation on the second Mon-
day of January succeeding the year of which said
license was issued." [Laws of 1909, p. 737, § 3.]

In holding that the proviso (which had the effect of

making all licenses expire on the second Monday of January in each year, while the fee required was the same in amount where one licensee procured his license at the beginning and another at the end of the year, thus exacting from one probably several times more than the other) was inoperative, we said:

"It seems to us that this proviso is so clearly inconsistent with, and repugnant to, the body of the act fixing the annual fee and declaring that the license shall be issued to the applicant, '*authorizing him to do business . . . for the term of one year from the date thereof,*' as to render it wholly inoperative, even though there should be no constitutional objections to it." *McKnight v. Hodge,* 55 Wash. 289, 104 Pac. 504, 40 L. R. A. (N. S.) 1207.

The proviso in § 3 of Art. XVI comes within the rule announced in *McKnight v. Hodge, supra.*

The statute before us does not, as the majority opinion states, declare the policy of the legislature to reserve the timber from present sale for disposal under some other plan free from constitutional objection.

It would be indeed a technical interpretation and strained construction, a reading into the statute of language other than that employed by the legislature, to express (as the majority opinion does) for the legislature an intent it clearly did not entertain when it enacted chapter 175, Laws 1933. The intent of the legislature is expressed in language of § 1 of chapter 175, Laws of 1933, which clearly and unmistakably provides that the *timber* on public lands *is reserved from sale to be sold* under a plan different from one then in force. However commendable that purpose or however laudable the conservation policy contemplated by the legislature, our duty is to declare the law.

"Where the language of a statute is transparent, and its meaning clear, there is no room for the office of construction. There should be no construction where

there is nothing to construe." *Lewis v. United States,* 92 U. S. 618, 621, 23 L. Ed. 513.

The plan contemplated by the statute contravenes the constitutional policy for the sale of an interest in public lands. All of the provisions of the statute are so interdependent that it can not reasonably be assumed that the legislature would have adopted any part of it without the adoption of the whole of it. It is not necessary to consider the other grounds of invalidity urged by counsel for relator.

The relator is entitled to make its application for the purchase of the timber, and it is the duty of the commissioner to receive that application. No question is presented as to the exercise of any discretion on the part of the commissioner as to the actual sale of the timber.

The writ should be granted.

HOLCOMB, J., concurs with MILLARD, J.